# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **EDMUND HENNESSY** ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Civil Action No. 08cv11724-NG** |
| ) | |
| **KATHLEEN DENNEHY,** ) | |
| **HAROLD W. CLARKE,** ) | |
| **LOIS A. RUSSO,** ) | |
| **THOMAS DICKHAUT,** ) | |
| **DUANE MACEACHERN,** ) | |
| **DR. MARIA ANGELES,** ) | |
| **DR. HAZARD,** ) | |
| **DR. ENOW,** ) | |
| **DR. ARTHUR BREWER,** ) | |
| **LINDA BOOTH, &** ) | |
| **TERRE MARSHALL,** ) | |
| **Defendants.** ) | |

**GERTNER, D.J.:**

## MEMORANDUM AND ORDER
## REGARDING MOTION FOR SUMMARY JUDGMENT
September 1, 2010

## I.    INTRODUCTION

Edmund Hennessy, the pro-se plaintiff in this action, is an inmate of the Massachusetts Department of Correction.  He has brought suit against several current and former officials and employees of the Department of Correction and against several medical professionals employed by the University of Massachusetts Correctional Health Program ("UMCH"), which has contracted with the Department to provide medical services to its inmates.  Mr. Hennessey's complaint alleges that the defendants failed to provide prompt, proper, and adequate medical care with regard to his need for hip replacement surgery.  He seeks damages and injunctive and declaratory relief under 42 U.S.C. § 1983 and Massachusetts state law.  This Memorandum and

Order addresses Harold Clarke, Lois Russo, Thomas Dickhaut, Duane MacEachern, and Terre Marshall's Motion to Dismiss or, in the Alternative, for Summary Judgment (document #45).

## II.     FACTS AND PROCEDURAL HISTORY[1]

Mr. Hennessey is presently serving a second-degree life sentence and has been incarcerated by the Massachusetts Department of Correction for approximately twenty-eight years.  (Pl.'s Am. Compl. ¶ 3, document #16.)  At the time Mr. Hennessey filed his first amended complaint in May 2009, he was fifty-eight years old.  Id.

Mr. Hennessey was taken to Tufts New England Medical Center on August 8, 2005, due to "long-standing pain in his lower extremities." Id. ¶ 18.  There, he received an MRI scan, which showed that he had a "right-sided herniated disc" and "degenerative disc disease." Id. ¶¶ 18-19.

In November 2005, Mr. Hennessey's hip was again evaluated by medical care providers on two separate occasions.  Id. ¶¶ 20-21.  According to Mr. Hennessy, these evaluations confirmed that he "was experiencing extreme pain, due in part [to] the multilevel degenerative changes in his spine, including a herniated disc and degenerative disease." Id. ¶ 22.

Although Mr. Hennessey was prescribed pain medication, he claims that the medication was inadequate to alleviate his pain and suffering.  Id. ¶ 23.  Mr. Hennessey alleges that he notified officials at the Souza-Baranowski Correctional Center ("SBCC") of his plight by submitting numerous "sick call" slips.  According to Mr. Hennessey, however, his requests for medical attention largely went unanswered.  Id. ¶¶ 22-23.  In particular, Mr. Hennessey alleges

---

[1] The Court's recitation of the material facts in this case is drawn primarily from Mr. Hennessey's complaint and the exhibits attached thereto.  The Court also draws from the materials submitted in support of Defendants Clarke, Russo, Dickhaut, MacEachern, and Marshall's Motion to Dismiss or, in the Alternative, for Summary Judgment (document #45), to the extent that the facts set forth in these materials are undisputed.

that Dr. Augustus Enow and Dr. Hazard, two UMCH employees who are named as defendants in

Mr. Hennessey's complaint but have yet to be served, were responsible for overseeing his care at

SBCC and largely ignored his requests for further medical treatment.  Id. ¶ 22.

On April 3, 2006, however, Mr. Hennessey was examined by Dr. Kenneth Pariser of the

Lemuel Shattuck Hospital ("LSH").  Id. ¶ 24.  In his report regarding his examination of Mr.

Hennessey, Dr. Pariser noted that Mr. Hennessey had "degenerative disease."  Id. ex. 4.  He

recommended that Mr. Hennessey continue taking his prescribed pain medications.  Id.

Furthermore, he noted:

> I would . . . recommend that [Mr. Hennessey] try to lose 20-30
> pounds.  If in fact this does not relieve his pain, then he is a perfect
> candidate for a total right hip replacement.  If he is unable to lose
> the weight, he still is a candidate for total hip replacement on the
> right.

Id.  Dr. Pariser's April 13, 2006, report is the linchpin of Mr. Hennessey's case.  According to

Mr. Hennessey, Dr. Pariser's evaluation should have made it clear to both his medical providers

and Department of Correction officials that he was in imminent need of hip-replacement surgery,

whether or not he took steps to alleviate the pain, namely, by losing weight.

In August 2006, Mr. Hennessey's employment in the prison kitchen was terminated

because he was required to take pain medications that prison officials believed might interfere

with his ability to perform his work duties.  Id. ex. 5.  Mr. Hennessey responded by filing an

administrative grievance complaining that the sudden revocation of his prison job was

unwarranted.  Id.  In addition, Mr. Hennessey's grievance noted that he was being "forced to

work and live in pain" and requested that his doctor be allowed "to treat [his] illness without

interference from outside sources."  Id.  When Mr. Hennessey's grievance was denied, he filed

an appeal in which he again challenged the revocation of his prison job and requested that he be given "the operation to fix [his] deformed hips."  <u>Id.</u>  Mr. Hennessey's appeal was denied by defendant Lois Russo, the former superintendent of the SBCC.  <u>Id.</u>  The description simply stated, "Inmates assigned to the kitchen must be cleared by medical staff per policy and clearance cannot be given at this time."  <u>Id.</u>

On approximately February 1, 2007, Mr. Hennessey fell when leaving the shower room at SBCC.  <u>Id.</u> ¶ 27.  X-rays taken immediately after the fall showed that Mr. Hennessey had a fracture in his right hip.  <u>Id.</u> ¶ 28.  After these x-rays were taken, Mr. Hennessey was seen once by someone on SBCC's medical staff, but "it took almost three months of complaining" before he saw an actual doctor.  <u>Id.</u>  Mr. Hennessey's complaint notes that Dr. Enow and Dr. Hazard, who as mentioned above have yet to be served, were the attending doctors assigned to SBCC at the time.  <u>Id.</u>  After Mr. Hennessey was examined by a doctor, he was given a walking device to assist him in ambulating.  <u>Id.</u>

On July 25, 2007, Mr. Hennessey filed a medical grievance with UMCH complaining that he had not received adequate medical treatment and requesting that he be allowed to receive a right-hip replacement.  <u>Id.</u> ex. 6.  On July 26, 2007, a UMCH representative wrote Mr. Hennessey a letter informing him that he had been approved for hip-replacement surgery and that LSH merely needed to schedule a date for the operation.  <u>Id.</u> ex. 7.

Upon Dr. Enow's referral, Mr. Hennessey was again examined at LSH on August 30, 2007.  <u>Id.</u> ¶ 31, ex. 8.  During the examination, the nurse practitioner who assessed Mr. Hennessey informed him that LSH would attempt to perform a surgery by October of that year.  <u>Id.</u> ex. 8.  However, after the examination, the nurse practitioner learned that LSH's surgeons

-4-

believed that Mr. Hennessey would need to receive pulmonary clearance and reduce his weight to approximately 170 pounds before he could undergo surgery.  At the time of the examination, Mr. Hennessey's weight was 234.5 pounds.  Id.; see also Defs.' Statement Undisputed Material Facts ¶ 24 (hereinafter "DSMF").

Mr. Hennessey notes that the surgeons' insistence that he lose approximately 65 pounds before undergoing surgery was inconsistent with Dr. Pariser's analysis in April 2006.  Dr. Pariser opined that Mr. Hennessey would be a "perfect candidate" for hip replacement if he lost 20 to 30 pounds and would still likely be a candidate for the procedure even without any weight loss.  (Pl.'s Am. Compl. ex. 4.)  Since Mr. Hennessey weighed 262 pounds when he was examined by Dr. Pariser, he had already lost the 20 to 30 pounds necessary to make him a "perfect candidate" for surgery by the time he was re-examined at LSH in August 2007.

On September 12, 2007, defendant Terre Marshall, who was then serving as the Director of the Department of Correction's Health Services Division, responded to a letter that Mr. Hennessey had written to Acting Commissioner James R. Bender on July 25, 2007.  The letter was forwarded to the Health Services Division in August 2007.  (DSMF ¶¶ 23, 25.)  In her September 2007 letter, Ms. Marshall explained that her office had been informed by UMCH that surgeons at LSH had determined that Mr. Hennessey could not undergo surgery until he lost a substantial amount of weight and received pulmonary clearance.  She further suggested that he contact the health care providers assigned to his facility if he was unsatisfied with the care he was receiving, and she reviewed the proper process for submitting a formal medical grievance. Id. ¶ 25; Marshall Aff. ex. A-5 (document #47-2).

On January 24, 2008, defendant Linda Booth, a nurse practitioner employed by UMCH, completed a "nutrition referral request" that noted that Mr. Hennessey needed assistance with his diet so that he could lose weight and become eligible for hip-replacement surgery.  (Pl.'s Am. Compl.¶¶ 12, 35, ex. 10.)  A handwritten notation on the form that is dated February 20, 2008, states that Mr. Hennessey was a "no show" for his nutrition appointment.  Id. ex. 10.  Mr. Hennessey contends that he missed the appointment because he was in a "special management unit" on February 20 and thus could not physically appear for the appointment unless escorted by prison staff.  Id. ¶ 35.  According to Mr. Hennessey, Ms. Booth bears the responsibility for ensuring that inmates in the "special management unit" are able to keep their medical appointments.  Id.

On February 26, 2008, Mr. Hennessey submitted a letter to defendant Duane MacEachern, the superintendent of MCI-Shirley (the correctional facility in which Mr. Hennessey was then housed).  The letter again requested hip-replacement surgery.  Id. ¶ 36.  Mr. Hennessey's letter was forwarded to Deputy Superintendent Scott Anderson, who responded on February 29, 2008, that he had been informed by the Department's "contractual medical provider" that Mr. Hennessey had been evaluated for hip surgery.  Id. ex. 12.  Mr. Anderson also wrote that he had been "informed that [the issues regarding Mr. Hennessey's hip] ha[d] been discussed with [Mr. Hennessey] by medical staff at MCI-Shirley."  Id.

On March 26, 2008, the Department of Correction's Health Services Division received a medical grievance appeal filed by Mr. Hennessey.  (Marshall Aff. ¶ 13.)  In the appeal, Mr. Hennessey complained that he was told in July 2007 that he would receive hip surgery in October 2007, but the surgery never took place.  Id. ex. A-6.  He also complained that he had

been denied his pain medications, and he requested that he be scheduled to receive a hip replacement.  Id.

Ms. Marshall, acting in her capacity as the Director of Health Services, responded to Mr. Hennessey's grievance appeal on March 28, 2008.  (Pl.'s Am. Compl. ex. 13.)  Ms. Marshall's letter noted that a member of her staff had contacted UMCH and been told that Mr. Hennessey "ha[d] not followed the recommendations of the [LSH] Orthopedic Clinic by loosing [sic] about 60 pounds."  Id.  She also wrote that her staff's investigation had revealed that Mr. Hennessey was "non-compliant with the dietary counseling" he had received and that surgeons at LSH worried that the risk of complications from an operation would be high unless Mr. Hennessey reduced his weight to approximately 170 pounds.  Id.  (Mr. Hennessey denies that he ever saw a dietician and thus claims that he could not have been "non-compliant with . . . dietary counseling."  Id. ¶ 39.)  Ms. Marshall concluded that UMCH was "offering appropriate health care services" and thus denied Mr. Hennessey's appeal.  Id. ex. 13.

On April 2, 2008, a staff attorney at Massachusetts Correctional Legal Services ("MCLS"), a not-for-profit legal services corporation, sent a letter on Mr. Hennessey's behalf to Ms. Marshall and Dr. Arthur Brewer, the Medical Director of UMCH.  Id. ex. 15.  (Although Dr. Brewer is named as a defendant in Mr. Hennessey's complaint, he has not yet been served.)  This letter requested that Mr. Hennessey be scheduled to receive hip-replacement surgery as soon as possible and in the meantime asked that prison and medical officials ensure that Mr. Hennessey received medication to control his serious pain.  Id.

On April 25, 2008, nurse practitioner Linda Booth performed a routine assessment of Mr. Hennessey's physical condition.  According to Ms. Booth's report of the examination, Mr.

Hennessey was "argumentative" and wanted to discuss only his pain medications and his need for surgery.  Id. ¶¶ 40-42, ex. 14.

On June 28, 2008, Mr. Hennessey sent a letter to Carol Mici, the Department of Correction's Director of Classification, in which he complained of the allegedly inadequate medical treatment he was receiving.  (Marshall Aff. ¶ 15.)  The letter was forwarded to Ms. Marshall in the beginning of July 2008.  Id.  In response, Ms. Marshall requested that her administrative assistant contact UMCH personnel regarding Mr. Hennessey's medical status and treatment plan.  Id. ¶ 16.  UMCH told the administrative assistant that Mr. Hennessey did not have a broken hip, as he had claimed in his letter to Ms. Mici and as had been previously diagnosed following his February 2007 fall.  Id.  UMCH also reported that Mr. Hennessey was no longer receiving narcotic pain medications because he had previously been found guilty of diverting his prescribed narcotics.  Id.  However, UMCH stated that Mr. Hennessey was receiving Voltaren, a prescription arthritic medication.  Id.  Ms. Marshall related what she had learned from UMCH in a letter to Mr. Hennessey dated July 8, 2008.  Id. ex. A-9.

On September 16, 2008, MCLS sent another letter to Ms. Marshall and Dr. Brewer on Mr. Hennessey's behalf, again requesting that Mr. Hennessey be reexamined to determine whether he could undergo surgery and be provided with effective pain medication.  (Pl.'s Am. Compl. ex. 16.)  Four days later, on September 20, 2008, a UMCH clinician requested that Mr. Hennessey receive an orthopedic consultation so that his right hip condition could be reevaluated.  (DSMF ¶ 34.)  UMCH granted the request, and on November 20, 2008, LSH added Mr. Hennessey to its surgical wait list.  Id.

Although LSH initially scheduled Mr. Hennessey's surgery for June 2009, the surgeons cancelled it after they learned that Mr. Hennessey had not stopped taking medications two weeks prior to the surgery.  Id. ¶ 35.  Finally, in early August 2009, Mr. Hennessey received a total right hip replacement.  Id. ¶ 36.  After a brief recovery period at LSH, where the surgery was performed, Mr. Hennessey was transferred to MCI-Shirley's Hospital Unit for further post-operative care.  Id.

Mr. Hennessey claims that the Department of Correction and UMCH failed to adequately respond to his persistent complaints of excruciating pain over a period of approximately four years and thereby caused him severe emotional distress and contributed to the further deterioration of his hips, right knee, and back.  (Pl.'s Am. Compl. ¶ 44.)  His complaint names as defendants Kathleen Dennehy, the former Commissioner of the Department of Correction; Harold W. Clark, the present Commissioner; Lois Russo, the former superintendent of SBCC; Thomas Dickhaut, the current SBCC superintendent; Duane MacEachern, the present superintendent of MCI-Shirley; Terre Marshall, the Department of Correction's Assistant Deputy Commissioner of Clinical Services and the former Director of the Health Services Division; and UMCH employees Dr. Maria Angeles, Dr. Hazard, Dr. Augustus Enow, Linda Booth, and Dr. Arthur Brewer.[2]  Mr. Hennessey has brought claims against all of these defendants for the alleged violation of his right to be free from cruel and unusual punishment

---

[2] The Court notes that the docket in this case also currently lists as defendants UMCH, the Department of Correction, the Department of Correction Health Services, MCI-Shirley, and SBCC.  Although it is somewhat ambiguous from the manner in which Mr. Hennessey has formatted the caption to his amended complaint, it appears that he did not intend to bring suit against these entities since they are not listed in the "parties" section of his complaint.  If the Court is incorrect and Mr. Hennessey did intend to bring suit against these entities, he should inform the Court of this fact by November 1, 2010.  Otherwise, the docket will be corrected to reflect the fact that these entities are not defendants in this case.

under the Eighth Amendment to the U.S. Constitution and article 26 of the Massachusetts

Declaration of Rights.  He has also sought relief under the common-law theory of negligence.

He seeks injunctive and declaratory relief and damages.


III.    **MOTION FOR SUMMARY JUDGMENT BY DEFENDANTS CLARKE, RUSSO, DICKHAUT, MACEACHERN, AND MARSHALL**

   A.    **Standard for Granting a Motion to Dismiss or, in the Alternative, for Summary Judgment**

   Defendants Clarke, Russo, Dickhaut, MacEachern, and Marshall have joined in a single

motion for summary judgment.  (Defs.' Mot. Summ. J., document #45.)  Although the motion is

styled as one for summary judgment, it actually seeks either dismissal under Federal Rule of

Civil Procedure 12(b)(6) or summary judgment under Rule 56.  As a result, the Court reviews

the different standards for granting motions under Rule 12(b)(6) and Rule 56.

   A Court should grant a motion to dismiss under Rule 12(b)(6) when the plaintiff has

failed to state a claim against an individual defendant upon which relief can be granted.  In

reviewing the adequacy of Mr. Hennessey's claims, the Court must bear in mind the fact that the

Federal Rules of Civil Procedure place only minimal demands on the pleader.  Gooley v. Mobil

Oil Corp., 851 F.2d 513, 514 (1st Cir. 1988).  Rule 8(a)(2) requires only "a short and plain

statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  In

addition, in its review of the defendants' motion to dismiss, the Court must accept all the well-

pleaded facts in Mr. Hennessey's complaint as true and must draw all reasonable inferences from

those facts in his favor.  Gooley, 851 F.2d at 514.  Nevertheless, the federal rules' minimal

pleading requirements "are not tantamount to nonexistent requirements."  Id.  Mr. Hennessey

cannot rely on "bald assertions" and "unsupportable conclusions" in his complaint to escape

dismissal and move his case to the discovery phase.  Id. (quoting Chongris v. Bd. of Appeals,

811 F.2d 36, 37 (1st Cir. 1987)).  In other words, to avoid dismissal, Mr. Hennessey's complaint

must make a minimal "showing," beyond the assertion of conclusory allegations, that he is

"entitled to relief."  Fed. R. Civ. P. 8(a)(2).

If a plaintiff's complaint is sufficient to survive a motion to dismiss, the next hurdle he

must surmount is a motion for summary judgment.  While a motion to dismiss tests whether a

plaintiff's claims are sufficiently pleaded to allow the case to proceed to discovery, a motion for

summary judgment requires the court to determine whether the plaintiff has demonstrated that

the case presents factual disputes that must be resolved at trial.  Accordingly, a motion for

summary judgment should be granted if "there is no genuine issue as to any material fact and . . .

the [party requesting summary judgment] is entitled to judgment as a matter of law."  Fed. R.

Civ. P. 56(c)(2).  In ruling on a motion for summary judgment, the Court may consider not only

the parties' pleadings but also any materials disclosed during discovery and any affidavits filed

in connection with the motion.  Id.  Although the "party moving for summary judgment bears the

initial burden of demonstrating that there are no genuine issues of material fact for trial," this

burden "may be discharged by . . . pointing out to the district court . . . that there is an absence of

evidence to support the nonmoving party's case."  Rochester Ford Sales, Inc. v. Ford Motor Co.,

287 F.3d 32, 38 (1st Cir. 2002) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986)).

"After such a showing, the 'burden shifts to the nonmoving party, with respect to each issue on

which he has the burden of proof, to demonstrate that a trier of fact reasonably could find in his

favor.'"  Id. (quoting DeNovellis v. Shalala, 124 F.3d 298, 306 (1st Cir. 1997)).  Ultimately,

"after examining the facts in the light most favorable to the nonmoving party and drawing all reasonable inferences in its favor," the Court must determine whether "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party."  Id. (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986)).  If so, the motion for summary judgment should be denied.  Otherwise, it should be granted.

Since Mr. Hennessey is proceeding pro se, the ordinary procedural rules must be applied to him more liberally than they would be to a party represented by counsel.  See Haines v. Kerner, 404 U.S. 519, 520-21 (1972); Raineri v. United States, 233 F.3d 96, 97 (1st Cir. 2000) ("The federal courts historically have been solicitous of the rights of pro se litigants."). However, the federal judiciary's traditional solicitude to the rights of pro se litigants cannot save Mr. Hennessey's claims against Commissioner Clarke, Ms. Russo, Mr. Dickhaut, Mr. MacEachern, and Ms. Marshall from dismissal or the entry of summary judgment in their favor. For the reasons set forth below, the defendants' motion must be granted, even under a liberal application of Rules 12(b)(6) and 56.

## B.     Mr. Hennessey's Eighth Amendment Claim

### 1.     *Legal Standards Governing an Eighth Amendment Claim Based on Inadequate Medical Treatment*

Mr. Hennessey has sought relief under 42 U.S.C. § 1983, which provides a cause of action to any individual whose federal constitutional rights have been violated by another individual acting "under color of" state law.  In particular, Mr. Hennessey alleges that the defendants violated his Eighth Amendment right to be free from "cruel and unusual punishments" by failing to provide him with prompt and adequate medical treatment for his hip

condition.  U.S. Const. amend. VIII ("Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted.").

Mr. Hennessey has brought suit against the defendants in both their official and individual capacities.  To the extent that Mr. Hennessey seeks damages from the defendants in their official capacities under section 1983, his claims must fail.  A suit for damages against a state official in his official capacity "is not a suit against the official but rather is a suit against the official's office.  As such, it is not different from a suit against the State itself."  Will v. Michigan Dep't of State Police, 491 U.S. 58, 71 (1989) (citation omitted).  And suits against states cannot be brought under section 1983.  Id. (holding that states are not "persons" under section 1983).  The Court, however, may entertain Mr. Hennessey's claim for declaratory and injunctive relief against the defendants in their official capacities and his claim for damages against the defendants in their personal capacities.  See Hafer v. Melo, 502 U.S. 21 (1991); Will, 491 U.S. at 71 n.10 ("[A] state official in his or her official capacity, when sued for injunctive relief, would be a person under § 1983 because 'official-capacity actions for prospective relief are not treated as actions against the State.'" (quoting Kentucky v. Graham, 473 U.S. 159, 167 n.14 (1985))).

As this Court has previously noted:

> Prisoners in the United States have a right to humane treatment, including a right to adequate care for their serious medical needs.  The Constitution does not protect this right because we are a nation that coddles criminals.  Rather, we recognize and respect this right because we are, fundamentally, a decent people, and decent people do not allow other human beings in their custody to suffer needlessly from serious illness or injury.

Kosilek v. Maloney, 221 F. Supp. 2d 156, 160 (D. Mass. 2002).  As a result, a state prison official's deliberate indifference to an inmate's serious medical needs violates the Eighth

Amendment and may give rise to liability under section 1983.  See Estelle v. Gamble, 429 U.S. 97, 104 (1976).

To prevail on his Eighth Amendment claim, Mr. Hennessey must prove that he had a serious medical need that was inadequately treated because of the defendants' deliberate indifference to his plight.  Kosilek, 221 F. Supp. 2d at 161.  To prove that the defendants were deliberately indifferent to his medical needs, Mr. Hennessey must prove that the defendants were more than merely negligent in their handling of his requests for surgery and a more effective pain-management regime.  Farmer v. Brennan, 511 U.S. 825, 835 (1994).  He must demonstrate that they knew of and disregarded "an excessive risk" to his health.  Id. at 837.  This is a subjective, not objective, test.  It is not enough for Mr. Hennessey to prove that the defendants failed to act in the face of an unjustifiably high risk of harm that should have been obvious to them.  Id. at 836.  The defendants must have been aware of facts from which they could draw the inference that Mr. Hennessey was suffering from a serious medical condition, and they must also have drawn that inference.  Id. at 837.

From these basic postulates flow a number of corollary principles.  First, ordinary medical malpractice involving the mere negligent diagnosing or treatment of a medical condition does not violate the Eighth Amendment.  Estelle, 429 U.S. at 106.  In addition, an inmate has no right to the treatment of his choice, as long as the treatment that he does receive is adequate.  Layne v. Vinzant, 657 F.2d 468, 473 (1st Cir. 1981).  Furthermore, a mere professional difference of opinion among an inmate's doctors generally cannot give rise to liability under section 1983, both because the prisoner has no right to his preferred treatment and because a good-faith dispute among doctors over the appropriate course of treatment tends to show that

-14-

neither doctor was deliberately indifferent to the prisoner's medical needs.  See McCracken v.

Jones, 562 F.2d 22, 24 (10th Cir. 1977).  Finally, prison officials are generally entitled to rely on

the opinions of the medical professionals who treat the prisoner.  See Layne, 657 F.2d at 471-72;

Camberos v. Branstad, 73 F.3d 174, 176 (8th Cir. 1995); Rosen v. Chang, 811 F. Supp. 754, 761-

62 (D.R.I. 1993).  Since most prison officials are not doctors, they cannot be said to have

consciously disregarded an inmate's serious medical needs when they have relied in good faith

on the expertise of the inmate's attending physicians.

        In this case, there seems to be little dispute that Mr. Hennessey had a serious medical

condition that required some form of treatment.  The medical records that Mr. Hennessey

attached to his complaint amply demonstrate the significant problems that Mr. Hennessey has

had with his hips and the serious pain that these issues have caused him.  There may also be a

trial-worthy dispute over the adequacy of the medical treatment that Mr. Hennessey has

received.  Mr. Hennessey, however, has not presented sufficient evidence for a reasonable jury to

find that defendants Clarke, Russo, Dickhaut, MacEachern, and Marshall, the Department of

Correction officials who have moved for summary judgment, were deliberately indifferent to his

medical needs.  Thus, summary judgment must be entered in their favor.  Eastman Kodak Co. v.

Image Technical Servs., Inc., 504 U.S. 451, 468-69 (1992) (noting that summary judgment

should be granted when no reasonable jury could find in the nonmoving party's favor).

        2.      *Mr. Hennessey's Eighth Amendment Claims Against Defendants Clarke*
                *and Dickhaut Must Be Dismissed.*

        Mr. Hennessey's Eighth Amendment claims against Commissioner Clarke and Mr.

Dickhaut must be dismissed under Federal Rule of Civil Procedure 12(b)(6).  Commissioner

Clarke and Mr. Dickhaut are not mentioned in the facts section of Mr. Hennessey's complaint,

and his allegation in count one that they were deliberately indifferent to his medical needs is

utterly conclusory.  Thus, Mr. Hennessey's section 1983 claims against Commissioner Clarke

and Mr. Dickhaut are not sufficient to meet even the minimal pleading requirements of Rule

8(a).  See Gooley, 851 F.2d at 514.

In addition, Mr. Hennessey has not supplemented the meager allegations made in his

complaint by offering more evidence against Commissioner Clarke and Mr. Dickhaut in

response to their motion for summary judgment.  It thus follows that even if Mr. Hennessey's

claims were adequately pleaded, the Court would be compelled to grant Commissioner Clarke

and Mr. Dickhaut summary judgment under Rule 56(c).

> 3.    *Defendants Russo, MacEachern, and Marshall Are Entitled to Summary*
>        *Judgment on Mr. Hennessey's Eighth Amendment Claims.*

In support of their motion for summary judgment, defendants have submitted an affidavit

from Terre Marshall, the former Director of the Department of Correction's Health Services

Division, that clarifies the relationship between the Department and UMCH.  UMCH is an

independent entity with which the Department contracts to provide medical and dental services

to its inmates.  (Mashall Aff. ¶ 3, document #47-2.)  The Department's contract with UMCH

provides that UMCH is:

> solely responsible for making all decisions with respect to the type, timing and
> level of services needed by Inmates . . . including, without limitation, the
> determination of whether an Inmate is in need of clinic care, hospitalization,
> admission to a clinic, referral to an outside specialist or otherwise needs
> specialized care.

Id. ex. A-1.  The Department has also adopted a policy that "[m]atters of medical, mental health

and dental judgment are the sole province of the responsible physicians, psychiatrists or

dentists."  Id. ex. A-2.  Thus, in matters related to inmates' medical care, the Department's

standard policy is to abide by the determinations of UMCH's doctors and other medical

professionals.  In light of this policy, Ms. Russo, Mr. MacEachern, and Ms. Marshall, who are all

Department employees and are not employed by UMCH, were all entitled to rely on UMCH to

properly address Mr. Hennessey's medical needs.[3]  See Rosen, 811 F. Supp. at 761-62 (holding

that a prison official is not "'deliberately indifferent' in relying on nurses and doctors licensed by

the State . . . to exercise informed medical judgment and to provide adequate health care").

     Mr. Hennessey's Eighth Amendment claim against Lois Russo, the former

superintendent of SBCC, is based solely on her denial of Mr. Hennessey's September 2006

grievance appeal.  (Pl.'s Am. Compl. ¶ 26.)  The original grievance on which this appeal was

based focused on Mr. Hennessey's claim that he had been unfairly removed from his job in the

prison kitchen.  Id. ex. 5.  In his appeal of the denial of his grievance, however, Mr. Hennessey

also requested that a doctor be allowed to "treat the pain associated with [his] illness without the

interference [of an] unnamed source" and that he be given an "operation to fix [his] two

deformed hips."  Id.  In her denial of Mr. Hennessey's appeal, Ms. Russo simply noted that

"[i]nmates assigned to the kitchen must be cleared by medical staff per policy and clearance

cannot be given at this time."  Id.  This single sentence is too slim a reed on which to hang an

Eighth Amendment claim.  Under the terms of the Department's contract with UMCH, Ms.

---

     [3] A different case might have been presented if defendants knew that UMCH regularly afforded prisoners substandard medical care.  If defendants had such knowledge, then they would arguably also have been aware of a substantial risk that Mr. Hennessey's hip condition would not be adequately treated.  Mr. Hennessey, however, has not offered evidence suggesting that UMCH routinely provides inmates inadequate medical care, much less that the defendants were aware of such a pattern of substandard treatment.  Cf. Estate of Chance ex rel. Humphreys v. First Corr. Med., Inc., 329 F. App'x 340, 343 (3d Cir. 2009) ("Deliberate indifference liability may . . . attach to non-medical prison administrators who fail in their supervisory capacity over medical staff.  To establish supervisory liability, a plaintiff must demonstrate: (1) the existence of a policy or practice that created an unreasonable risk of an Eighth Amendment violation; (2) the supervisor's awareness of the creation of the risk; (3) the supervisor's indifference to the risk; and (4) that the plaintiff's injury resulted from this policy or practice.").

Russo was entitled to rely on UMCH to provide Mr. Hennessey with any medical care that he needed.  Thus, it is not surprising that Ms. Russo largely ignored Mr. Hennessey's medical complaints in her denial of his appeal and instead focused on the complaint raised in his original grievance—namely, his unfair removal from his prison job.

Mr. Hennessey also provides insufficient evidence to survive summary judgment on his Eighth Amendment claim against Duane MacEachern, the superintendent of MCI-Shirley. According to Mr. Hennessey, he wrote Mr. MacEachern a letter on February 26, 2008, requesting hip surgery.  Id. ¶ 36.  Deputy Superintendent Scott Anderson responded on Mr. MacEachern's behalf in a letter dated February 29, 2008.  Id. ex. 12.  In this letter, Mr. Anderson noted that he had been informed by UMCH that Mr. Hennessey had been evaluated for hip surgery and that his medical condition had been discussed with him by MCI-Shirley's medical staff.  Id.  Based on this information, Mr. Anderson and Mr. MacEachern were entitled to rely on the medical professionals who had examined Mr. Hennessey to provide him with appropriate medical treatment.  There is thus no evidence from which a reasonable jury could conclude that Mr. MacEachern was deliberately indifferent to Mr. Hennessey's medical condition.

Mr. Hennessey's Eighth Amendment claim against Ms. Marshall presents a slightly closer case.  In her former capacity as Director of the Department's Health Services Division, Ms. Marshall wrote at least three letters to Mr. Hennessey regarding his hip condition.  She was thus well apprised of his allegations that he was receiving inadequate medical treatment and was in immense pain.  These letters, however, also reveal that Ms. Marshall relied on representations from UMCH that Mr. Hennessey needed to lose a significant amount of weight before he could safely undergo surgery.  This reliance was reasonable.  Although Ms. Marshall has a masters

degree in public health, she is not a doctor.  (Marshall Aff. ¶ 1.)  In addition, she did not "have

any direction or control over UMCH and its employees in the clinical decision-making process."

Id. ¶ 5.  As explained above, the responsibility for making professional judgments regarding

inmates' medical care was vested in UMCH's doctors and nurses.  Id.  Given this arrangement,

Ms. Marshall's reliance on the medical judgments of Mr. Hennessey's attending physicians does

not qualify as the sort of "deliberate indifference" necessary to give rise to a claim under the

Eighth Amendment.[4]

> **C.    Mr. Hennessey's Negligence Claims Against Defendants Clarke, Russo,
>         Dickhaut, MacEachern, and Marshall Must Be Dismissed Because They Are
>         Statutorily Immune from Negligence Suits.**

Massachusetts immunizes public employees from liability for injuries caused by any

negligent acts that they perform within the scope of their offices or employment.  Mass. Gen.

Laws ch. 258, § 2.[5]  Since Mr. Hennessey does not allege that Commissioner Clarke, Ms. Russo,

Mr. Dickhaut, Mr. MacEachern, and Ms. Marshall caused him harm in any capacity other than

their capacity as officials or employees of the Department of Correction, his negligence claims

against these defendants must be dismissed.  See Petricca v. City of Gardner, 194 F. Supp. 2d 1,

4 (D. Mass. 2002); McNamara v. Honeyman, 546 N.E.2d 139, 141 (Mass. 1989); see also Fed.

R. Civ. P. 12(b)(6).

---

[4] The Court notes that Commissioner Clarke, Ms. Russo, Mr. Dickhaut, Mr. MacEachern, and Ms. Marshall have also argued that they are entitled to qualified immunity from a damages award on Mr. Hennessey's section 1983 claim.  Since the Court has concluded that Mr. Hennessey has failed to provide sufficient evidence that these defendants violated his Eighth Amendment rights, it necessarily follows that they are entitled to qualified immunity since their conduct did "not violate [a] clearly established . . . constitutional right[] of which a reasonable person would have known."  Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).

[5] This is not to say that Massachusetts residents have no remedy for harm inflicted by the negligence of public employees.  Mass. Gen. Laws ch. 258, § 2 simply makes the Commonwealth liable in the negligent employee's stead.  See McNamara v. Honeyman, 546 N.E.2d 139, 141 (Mass. 1989).

**D.**     **Judgment Must Be Entered Against Mr. Hennessey on His Claims Against Defendants Clarke, Russo, Dickhaut, MacEachern, and Marshall Under Article 26 of the Massachusetts Declaration of Rights.**

Mr. Hennessey also seeks relief under article 26 of the Declaration of the Rights of the Inhabitants of the Commonwealth of Massachusetts, which prohibits the infliction of "cruel or unusual punishments." Mass. Const. pt. 1, art. 26. The protections afforded by article 26 are at least as broad as, if not broader than, those guaranteed by the Eighth Amendment. Michaud v. Sheriff of Essex County, 458 N.E.2d 702, 708 (Mass. 1983). Whatever daylight there might be between article 26 and the Eighth Amendment, however, cannot in this case save Mr. Hennessey's article 26 claims from the same fate as his claims under the U.S. Constitution. It appears that the Eighth Amendment's "deliberate indifference" standard applies with equal force to claims under article 26. See 'Abdullah v. Sec'y of Pub. Safety, 677 N.E.2d 689, 694 (Mass. App. Ct. 1997) ("[T]o be held liable under the Eighth Amendment for denying an inmate humane conditions of confinement, a prison official must know and disregard an excessive risk to inmate health or safety. It would appear that art. 26 of the Declaration of Rights has the same two requirements." (citation omitted)); see also Good v. Comm'r of Corr., 629 N.E.2d 1321, 1325 (Mass. 1994) (noting that a violation of article 26 may have occurred if the drinking water at a particular prison where the plaintiff was held "pose[d] a substantial risk of serious harm to his health and the [Department of Correction] *ha[d] knowledge of the situation and ignore[d] it*" (emphasis added)). Thus, the Court's earlier conclusion that Mr. Hennessey has failed to present sufficient evidence that Commissioner Clarke, Ms. Russo, Mr. Dickhaut, Mr. MacEachern, and Ms. Marshall were deliberately indifferent to his need for medical treatment dooms his article 26 claims with respect to these defendants.

**IV.     CONCLUSION**

In light of the above analysis, it is hereby Ordered that The Motion to Dismiss or, in the

Alternative, for Summary Judgment (**document #45**) filed by Harold Clarke, Lois Russo,

Thomas Dickhaut, Duane MacEachern, and Terre Marshall is **GRANTED**.

**SO ORDERED.**

**Date:   September 1, 2010**          /s/ *Nancy Gertner*

                                                     **NANCY GERTNER, U.S.D.C.**